464 A.2d 1327

**COMMONWEALTH of Pennsylvania**

**v.**

**William CARTER, Jr., Appellant.**

Superior Court of Pennsylvania.

Submitted April 28, 1983.

Filed Aug. 19, 1983.

Abraham A. Hobson, III, Norristown, for appellant.

Joseph A. Smyth, District Attorney, Norristown, for Commonwealth, appellee.

Before ROWLEY, WIEAND and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the denial of appellant's, William Carter's, Post-Conviction Hearing Act (PCHA) Petition (19 P.S. § 1180–1 *et seq.*) by the Court of Common Pleas of Montgomery County. We affirm.

By Order of the Supreme Court of Pennsylvania dated September 12, 1977, the Superior Court's *per curiam* affirmance of the lower court's dismissal of appellant's 1975 PCHA petition without a hearing was reversed. The record was remanded to the lower court to determine, after an evidentiary hearing, the truthfulness of appellant's allegation that his guilty pleas were illegally induced.

Before examining what transpired at the PCHA hearing, it is necessary, in order to place this case in perspective, to set forth the allegations of the appellant as they appear in his 1975 *pro se* PCHA petition. In that portion of the PCHA petition which requests "the facts in support of the alleged error(s) upon which th[e] petition is based ..." is typed the following:

(1) The Attorney for the Commonwealth threatened to file additional criminal charges against the petitioner if he did not honor the plea bargain:

(2) The bargain consisted of a prison term of Three (3) to Eight (8) years but the petitioner was sentenced to a prison term of Five (5) to Ten (10) years: Petitioner was also sentenced to pay restitution which was not a part of the bargain:

(3) The Attorney for the Commonwealth also made a part of the bargain that the two remaining charges of "simple Assult" [sic] would be *Nol Pros:* But the Petitioner was given an [sic] consecutitive [sic] sentences to follow the one he is presently serving:

(4) Prior Convictions was [sic] brought up befoer [sic] the plea was accepted:

(Appellant's 1975 PCHA petition at 3)

In a document attached to the PCHA petition, captioned "Memorandum of Law," appellant repeated his allegation that, "The plea of guilty arose out of a *THREAT,* made by the Prosecutor, who said "That if I didn't plead guilty that additional charges would be placed on me ....[']'" In response, the Commonwealth filed an "Answer to Post Conviction Hearing Act Petition," wherein it set forth, *inter alia,* that:

\* \* \* \* \* \*

(a) *A plea of guilty unlawfully induced (promises and threats made to induce the plea)*—it is denied that the guilty plea was unlawfully induced, and it is averred, to the contrary, that the plea was voluntary, and that there were no improper threats or promises.

\* \* \* \* \* \*

(*l*) It is denied that the Commonwealth threatened to file additional criminal charges if the petitioner did not honor his plea bargain, but to the contrary the notes of testimony of the guilty plea clearly set forth that, in connection with the guilty plea, there were assurances given by the Assistant District Attorney that nothing

would be pursued with respect to possible charges by the Ambler Police Department because of the decision to enter the guilty plea (N.T. 7).

(Emphasis in original)

With the preceding as a backdrop, we can now examine what occurred at the December 9, 1977 PCHA hearing, which was restricted to the resolution of appellant's claim that he was "threatened" by the attorney for the Commonwealth that if he did not plead guilty "additional criminal charges [would be filed] against [him.]" (R.R. 5)

The first witness to take the stand was the appellant, who recounted how, on the day set for his trial for the July 31, 1974 robbery of a fast-food convenience ("Wawa") store, he and his defense attorney (Mr. Narducci) had been discussing whether to accept a plea bargain offered by the assistant district attorney (Mr. Furber). Appellant recalled, in response to his own counsel's (Mr. Hobson's) inquiry as to what additional charges were threatened, that:

A  Well, when Mr. Furber and Mr. Narducci first—

      \*     \*     \*     \*     \*     \*

A  Yes. We were all at the defense table. And they said that—

Q  Who is they when you say they?

A  Mr. Furber and Mr. Narducci, when they were talking to me about the plea bargain. At first I wasn't going to accept it. Right? That's when Mr. Furber told me about the sporting goods store in Ambler. And he said that if I didn't take the plea bargain to five to ten for the Wawa store, that they were going to take me down and arrest me for the robbery of the sporting goods store.

      \*     \*     \*     \*     \*     \*

BY MR. HOBSON:

Q  ... Mr. Carter, the substance of your allegation is that you pled guilty on the threat of the Commonwealth that they would charge you with the additional [Am-

bler, Pa.] robbery[, which occurred on July 26, 1974,] if you did not accept the plea bargain?

A  Yes.

(RR. 6–7 & 9)

On cross-examination, appellant was asked a series of questions regarding the April 29, 1975 guilty plea colloquy conducted before Judge Honeyman.  He recalled that at that time he indicated no one threatened or forced him to enter his plea and he understood the nature of the agreement.  He also admitted that during the plea bargain discussion the prosecutor talked to him and Mr. Narducci.  His recollection was that after telling the prosecutor that the offer of "five to ten years was too much," (RR. 12), according to the appellant the prosecutor "later stated that he would try to get [appellant] back on the reconsideration of three to eight years, try to get [appellant] three to eight years." *Id.*  Appellant indicated this conversation occurred before the entry of the guilty plea at defense counsel's table.

However, when counsel for the Commonwealth asked appellant why he did not object to the prosecutor's recommendation at the plea to the accused receiving a sentence of five to ten years and the non-pros of the two simple assaults, the following exchange ensued:

A  Well, really, I didn't know any better.  I was afraid because—

 \*     \*     \*     \*     \*     \*

THE COURT: Afraid because of what?

A  I was afraid if I had spoke up [sic] that the plea bargain would not have been accepted and the additional charges would have been filed against me on another robbery charge.

THE COURT: Well, I addressed the questions to you, did I not, about the plea?

A  Yes.

THE COURT: Were you afraid of me?  I wasn't in on the agreement.

A  No.

258

THE COURT: Why did you answer untruthfully to me?

A I was saying what I thought I was supposed to say.

THE COURT: Well, who told you what you were supposed to say?

A Nobody told me what to say.

THE COURT: All right.

MR. WILLIAMSON [Commonwealth's PCHA attorney]:

Q Mr. Carter, didn't you realize that when your attorney got up and said to the court that the [assistant] district attorney is going to recommend to the court that Mr. Carter be sentenced to a term of five to ten years on all charges to which he's pleading guilty, on the notes of testimony, page 6, didn't you understand that that would mean that in all likelihood you would, in fact, be sentenced to five to ten and not three to eight?

A Yes.

Q Then why didn't you say anything at that time to the court? Say to the court, gee, your Honor, my understanding was three to eight.

A Because, like I said before, I understood that he [the assistant district attorney] was going to ask for five to ten.

Q A-huh?

A But, to my understanding, I thought I was going to be called back down to court on the reconsideration and get three to eight years.

Q After the judge had already accepted the plea of guilty and a recommendation of a sentence of five to ten?

A Yes.

Q You thought that the judge then was going to reconsider it and give you three to eight?

A Yes.

(RR. 15–17)

It is to be noted that not until after the jury had been empanelled and an opening statement made by the prosecutor was there a motion to sequester the witnesses, which was granted upon request of the prosecution. Thereafter, the trial court was informed that the appellant agreed to plead guilty to the offenses charged. At this point in the discussion it is relevant to recite what was stated by defense counsel at the guilty plea hearing. It is reproduced in the PCHA court's Opinion to this Court and the content thereof is not contested by appellant's appellate counsel. To-wit:

It is agreed that the sentences of all cases would total five years to ten years[—this remark was stated by the PCHA judge, who also presided over appellant's guilty plea proceeding]. Finally, defense counsel stated as follows:

"... it is also understood between Mr. Furber (Assistant District Attorney) and I, with the understanding that the court has played no part in this agreement, that there are at the present time a set of circumstances growing out of an incident in Ambler to which both the Ambler police and Mr. Furber have given assurances that nothing would be filed against Mr. Carter in conjunction with those charges because of his decision to enter a plea of guilty in this case today." (N.T. 6–7)

Following that there was a further colloquy at the conclusion of which the trial judge stated

"THE COURT: All right, then, so long as the defendant understands that I have no power to nor would I participate in such a decision. It would be beyond the scope of my authority. I cannot act on anything except that which is before the court, and there is nothing before the court concerning Mr. Carter, concerning that Ambler robbery.

MR. NARDUCCI: That is correct.

THE COURT: So that I can offer him no sanctuary, solace, or immunity with regard to that.

MR. NARDUCCI: That is correct. The purpose of my statement for the record was simply to memorialize the understanding between Mr. Furber and Officer Wack [of Ambler, Pa.] and myself, and Mr. Carter."

(N.T. 7–8)

(PCHA court's Opinion at 2–3)

The next witness to testify was Mr. Furber, who, "[a]s best [as he] c[ould] recollect," indicated that, as was customary between the defense attorney and the assistant district attorney, conversation was had with appellant's counsel as to what, if anything, the Commonwealth might recommend as a sentence. The conversations between counsel "probably extended from the suppression hearing into the next day," when the prosecutor opened to the jury. (RR. 23)

Since the prosecutor was preparing to try the appellant for robbery, criminal trespass, receiving stolen property, violation of the uniform firearms act, simple assault and conspiracy, (RR. 19), he initially offered to "recommend to the court, seven and a half to fifteen years," (RR. 21), if appellant elected to plead. This was not acceptable. During the course of these discussions, Mr. Furber recalled indicating to Mr. Narducci that there was an investigation that was still in progress concerning the robbery in Ambler, and that the investigation "indicated that [appellant] was involved." (RR. 25) This information, as far as Mr. Furber was concerned, "certainly ... was taken into consideration" in negotiating the ultimate plea bargain. *Id.*

After the initial offer by the prosecution was refused by appellant, Mr. Furber "moved off of [his] original thoughts of seven and a half to fifteen years, and made a recommendation or evidenced to Mr. Narducci that it possibly would be appropriate to recommend to the court five to ten years, but no less than that." (RR. 23) This offer was "conveyed" to appellant, who, again, would not accept it. Thereafter, Mr. Furber opened to the jury.

When Mr. Furber was asked if any "assurances" were given to the appellant to the effect that no charges would

be filed against him in conjunction with the Ambler robbery, the following appears of record:

[MR. FURBER:]

A  Sure.  Now, that was not in the way of any threat on my part.  It was simply an acknowledgement that was made to the defense attorney in this case, and there was nothing surreptitious about it.

As a matter of fact, I was about to point out that we wanted to make sure that the judge also knew that at least these were our thoughts, at least my thoughts as a DA, and I thought Mr. Narducci's as Mr. Carter's defense attorney at that time.

But as far as threatening conduct, no, I don't think I could characterize it as a threat.

[MR. WILLIAMSON—Commonwealth's PCHA attorney]:

Q  Now, you've heard the defendant testify that you came over to counsel table on the day of the hearing and made reference to the fact that additional charges might be brought against him.

Did you make any statement of any nature to the defendant, talk directly to the defendant?

A  I don't recall asking Mr. Carter any questions directly or making any statements to him directly.

Now, what he referred to may, in fact, be correct, that is, that I approached counsel table prior to the time I opened to the jury—I don't remember, in the morning or after the suppression hearing—and talked with—

Q  Well, Mr. Narducci was also at that counsel table.

A  Oh, certainly.  I did not, in any way, shape or form in this case, talk to Mr. Carter by himself, if that is what he indicated.

THE COURT:  But he could well have overheard.

A  Certainly, your Honor.

Q  Do you have any recollection as to any promises that you made to the defendant that he would get a recommended sentence of three to eight years instead of what the ultimate plea bargain turned out to be, five to ten?

A   I don't have any recollection of that at all.   Absolutely none.

(RR. 25–27)

On cross-examination, Mr. Furber disputed appellant's counsel's characterization that he "indicated to Mr. Carter that if [appellant] did not plead guilty that charges would be brought against him for the [Ambler] sportman's store job[.]" (RR. 29) Rather, Mr. Furber, sometime prior to his opening statement to the jury, had a three-way conversation with the appellant and his counsel in which he stated, "Rocco Wack, the detective from Ambler[,] ... indicated to [him] that if, in fact, Mr. Carter admitted his guilt in the Wawa robbery, that at that particular time the investigation concerning the Ambler robbery would, in essence, be complete.... [T]he Ambler police department was not interested in pursuing charges against Mr. Carter." (RR. 30–31) In other words, Detective Wack "said he would not press the charges against Mr. Carter." (RR. 32) The reason the channels of communication were kept open prior to, as well as including, the trial phase, according to Mr. Furber, "was to continue whatever negotiations we had on-going." (RR. 34)

To a point, Mr. Narducci, the last witness to appear, reaffirmed Mr. Furber's version of what transpired. For example, Mr. Narducci agreed that the first offer of seven and a-half to fourteen years was unacceptable. Also, that the two had discussed the matter "for some time in an attempt to work out a plea disposition[.]" (RR. 38) However, Mr. Narducci's accounting of how the two struck an agreement at five to ten is not as clear. According to Mr. Narducci, the assistant district attorney, appellant and he did not act in concert at all times. As he states it, he "was kind of shuttling back and forth between Mr. Furber and Mr. Carter." (RR. 40) After the five to ten figure had been agreed upon, Mr. Narducci then went back and told the appellant, "we have a new wrinkle in this matter." *Id.*

That being that apparently they [Mr. Furber and Detective Wack] had information which would be sufficient to

proceed against [appellant] in another robbery in Ambler area, and [he—Mr. Narducci—was] told that they wo[uld not] bring these charges in the event [appellant] agree[d] to the five to ten recommendation....

The discussion after that point, between Mr. Carter and [Mr. Narducci], revolved around what assurances [he] could provide him, as well as in [his] own mind [he] was concerned with what assurances [he] could be provided with, to make sure that if [he and appellant] accepted this arrangement that it would not be reneged on in any way. Because it goes without saying that [he] had Mr. Carter's best interest at heart at that point, and [he] wanted to make sure that it couldn't come back on him.

[He] remember[ed] going back and talking to Mr. Furber, and [he] believe[d he] also talked to Detective Wack. And [he] asked, how d[id he] know that what [they said they were] going to do [was] what [was] going to happen?

And they said, well, you have my word. You know me, I've been around here for a while.

THE COURT: Who is saying this, Furber or Wack?

A   Both, your Honor....

(RR. 40–41)

Narducci went on to testify that some of the discussion "took place collectively" among all three, "rather than being directed to any individual specifically." (RR. 42) When questioned on cross, Narducci also stated that Mr. Furber never mentioned anything about a sentence of three to eight years. (RR. 44) Shortly thereafter, the hearing came to an end and counsel for both sides presented closing arguments to the PCHA court.

The PCHA court, after finding as a fact that the assistant district attorney neither "threatened" appellant in any fashion nor "promised" him anything if he pleaded guilty, concluded as a matter of law that the pleas of guilty were not "illegally induced by either the [Assistant] District Attorney, defense counsel or the court, with respect to any representations concerning any other criminal proceedings or with respect to any promises or representations outside

of the explicit terms of the plea agreement pursuant to which the pleas of guilty were entered." (PCHA court's Opinion at 3) This appeal followed.

■■■ Presently, appellant seeks to withdraw his plea after the imposition of sentence. The standard for granting withdrawal at this stage of the proceedings is that of "manifest injustice." *Commonwealth v. Starr*, 450 Pa. 485, 301 A.2d 592 (1973). "Manifest injustice" occurs where the accused makes an involuntary plea. *Id.* Upon a finding that a plea was involuntary, the court should permit withdrawal in order to correct a "manifest injustice." The defendant is so entitled, it would appear, as a matter of right. *Commonwealth v. Ammon*, 275 Pa.Super. 324, 418 A.2d 744 (1980). However, the determination of the existence of "manifest injustice" is in the first instance for the trial court, which initially accepted the plea. *Commonwealth v. Starr, supra;* Pa.R.Crim.P. 320. Also, it needs to be remembered that the burden is on appellant to prove that his plea was not voluntary. *Commonwealth v. Johnson*, 273 Pa.Super. 488, 417 A.2d 753 (1979). Consistent therewith, albeit "[a] guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void[,]" *Machibroda v. United States*, 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962), appellant has not met this burden.

Historically, the vital role plea bargaining plays in this Commonwealth has not gone unrecognized. This Court has remarked:

It is well recognized that the guilty plea and the frequently concomitant plea bargain are valuable implements in our criminal justice system. *See Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Commonwealth v. Alvarado*, 442 Pa. 516, 276 A.2d 526 (1971); *Commonwealth v. McKee*, 226 Pa.Super. 196, 313 A.2d 287 (1973). "The disposition of criminal charges by agreement between the prosecutor and the accused, ... is an essential component of the administration of justice. *Properly administered, it is to be encouraged."* Santo-

*bello v. New York*, 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (emphasis added). In this Commonwealth, the practice of plea bargaining is generally regarded favorably, *Commonwealth v. Zuber*, 466 Pa. 453, 353 A.2d 441 (1976); *Commonwealth v. Alvarado, supra; Commonwealth ex rel. Kerekes v. Maroney*, 423 Pa. 337, 223 A.2d 699 (1966), and is legitimized and governed by court rule. Pa.R.Crim.P. 319(b). The desirability of disposing of criminal charges through plea bargaining is based on the premise that frequently a plea agreement is advantageous to all concerned:

> "The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail while awaiting completion of criminal proceedings." *Blackledge v. Allison, supra* [431 U.S.] at 71, 97 S.Ct. at 1627–28.

*Commonwealth v. Schmoyer*, 280 Pa.Super. 406, 413–14, 421 A.2d 786, 789–790 (1980). With these considerations in mind, we find additional guidance as to the manner in which we should rule from the United States Supreme Court's most recent pronouncement on the subject of plea negotiations in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), reh. denied, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978).

In *Bordenkircher*, Paul Hayes was indicted by a county grand jury in Kentucky for uttering a forged instrument. After arraignment, Hayes, his counsel and the Commonwealth's attorney met to discuss a possible plea agreement. The prosecutor offered to recommend a sentence of five years in prison if Hayes would plead guilty. He also said that if Hayes did not plead guilty he would seek a grand jury indictment under Kentucky's recidivist statute, which

would subject Hayes to a mandatory sentence of life imprisonment by reason of his prior felony convictions. Hayes decided not to plead guilty, and the prosecutor did secure the indictment he had promised.

A jury found Hayes guilty of the uttering charge and, in an independent proceeding, also found him to be a recidivist. As called for by Kentucky law, he was sentenced to life imprisonment. The Kentucky Court of Appeals rejected Hayes' constitutional objections to the enhanced sentence. The Sixth Circuit Court of Appeals reversed the Court's judgment, on the ground that the prosecutor's conduct during the bargaining negotiations had violated the principles of *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), which protected defendants from the vindictive exercise of a prosecutor's discretion. Hayes was ordered discharged.

The United States Supreme Court, speaking through Justice Stewart, disagreed with the Sixth Circuit Court of Appeals that the prosecutor was acting "vindictively" and in violation of due process of law because his charging decision was influenced by what he hoped to gain in the course of plea bargaining negotiations. In the course of making its ruling, the high Court made statements relevant to the case at bar:

... [I]n the "give-and-take" of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.

Plea bargaining flows from "the mutuality of advantage" to defendants and prosecutors, each with his own reasons for wanting to avoid trial. *Brady v. United States, supra*, 397 U.S. [742], at 752, 90 S.Ct. [1463], at 1471 [25 L.Ed.2d 747]. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. 397 U.S., at 758, 90 S.Ct., at 1474. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that

a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. See ABA Project on Standards for Criminal Justice, Pleas of Guilty § 3.1 (App. Draft 1968); Note, Plea Bargaining and the Transformation of the Criminal Process, 90 Harv. L.Rev. 564 (1977). Cf. *Brady v. United States, supra,* at 751, 90 S.Ct., at 1470; *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162.

While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable"— and permissible—"attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Chaffin v. Stynchcombe, supra,* 412 U.S. [17], at 31, 93 S.Ct. [1977] at 1985 [36 L.Ed.2d 714]. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.

*Id.* 434 U.S. at 363–364, 98 S.Ct. at 668, 54 L.Ed.2d at 610–611.

Instantly, it cannot be gainsaid that the appellant had at all times, with the knowledge and advice of his attorney, the option freely to accept or reject the prosecution's offer. In fact, appellant's guilty plea counsel memorialized the offer from the prosecution, in regard to Detective Wack agreeing not to pursue the investigation as to the Ambler robbery as the *quid pro quo* for appellant's willingness to plead guilty, by having it placed on the record for transcription. Thus, we have no evidence of surreptitious activity characteristic of subtle "threats or promises" kept from the purview of the guilty plea court. Quite the contrary, everything was out in the open and, as can be gleaned from the testimony

reproduced *supra* at the PCHA hearing, truly epitomizes the "give-and-take" of plea bargaining.

■ As stated by appellant's guilty plea counsel at the PCHA hearing, he, in acting in the best interest of his client, advised appellant to accept the plea bargain. We cannot find fault with this counseling, given the particular circumstances presented to this Court. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967). Stated otherwise, we find that there are sufficient facts within the record for this Court to determine that the alternative of pleading guilty was one for which there was a reasonable basis. *Cf. Commonwealth v. Marsh*, 460 Pa. 253, 333 A.2d 181 (1975).

■ Moreover, in accordance with the finding of the PCHA court, we hold that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the appellant with the unpleasant alternatives of foregoing trial or facing charges on which he might be subject to prosecution, did not constitute "unlawful inducement" nor will it be equated with "manifest injustice" warranting the withdrawal of the guilty pleas. *See Bordenkircher v. Hayes, supra; Commonwealth v. Starr, supra.*

Order affirmed.